IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEVIN M. ALEY,                      )
                                    )
        Plaintiff,                  )
                                    )
        vs.                         )  Civil Action No. 07-1113
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

## MEMORANDUM OPINION

### I.   INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Kevin M. Aley and Defendant Michael J.
Astrue, Commissioner of Social Security.  Plaintiff seeks review of
final decisions by the Commissioner denying his claims for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security
income benefits ("SSI") under Title XVI of the Social Security Act,
42 U.S.C. §§ 1381 *et seq.*  For the reasons discussed below,
Plaintiff's motion is denied and Defendant's motion is granted.

### II.  BACKGROUND

#### A.   Factual Background

Plaintiff Kevin M. Aley graduated from high school in
1980 and received a certificate in electronics technology from
Greensburg Institute of Technology in June 1984.  (Certified Copy

1

of Transcript of Proceedings before the Social Security Administration, Docket No. 4, "Tr.," at 231-232.) He did not work in that field, however, but instead was employed for the next several years as a salesman, telemarketer, cable installer, line cook, and pizza delivery person. (Tr. 73.)

At some point, Mr. Aley was diagnosed with bi-polar disorder and adult onset attention deficit/hyperactivity disorder ("ADHD.") He began treatment in March 2001 through the Comprehensive Counseling Center at Westmoreland Regional Hospital in Greensburg, Pennsylvania. At approximately the same time, he was unable to continue working full time and thereafter held a number of short-term, part-time jobs. Mr. Aley was working as a pizza cook and delivery person in December 2004 when he had an argument with the owner of the shop. According to Plaintiff, although his supervisor claimed he understood Mr. Aley's difficulties with "bi-polar personalities" and attention deficit disorder, "that still didn't stop him from yelling and screaming at me when he had a bad day or I was late or he thought he caught me not working." (Tr. 58.) Plaintiff stopped working entirely as of December 31, 2004.

B.    Procedural Background

On September 16, 2005, Plaintiff applied for a period of disability and disability insurance benefits, claiming disability

2

as of March 1, 2005, due to arthralgia,[1] bi-polar disorder, and ADHD. (Tr. 57.) After the application was denied on March 14, 2006 (Tr. 33-36), Mr. Aley timely requested a hearing before an Administrative Law Judge ("ALJ.")[2]

On November 13, 2006, a hearing was held before the Honorable Patricia C. Henry at which Plaintiff was represented by counsel. Judge Henry issued her decision on January 26, 2007, denying DIB and SSI benefits. (Tr. 14-25.) The Social Security Appeals Council declined to review the ALJ's decision on July 5, 2007, finding no reason pursuant to its rules to do so. (Tr. 5-7.) Therefore, the January 26, 2007 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on August 14, 2007, seeking judicial review.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of

---

[1] Arthralgia is a general term for pain in one or more joints. *See* the National Institute of Medicine's on-line website, Medline Plus, at www.nlm.nih.gov/medlineplus/mplusdictionary (last visited June 5, 2008.)

[2] While his request for a hearing on his DIB application was pending, Plaintiff applied for SSI benefits on May 17, 2006. (Tr. 219-222.) Rather than going through the usual review process, the SSI application was immediately escalated to hearing level. (Tr. 218.)

the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

4

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, \*3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.  The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[3] currently existing in the national economy.[4]  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  To be

---

[3] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

[4] The claimant seeking supplemental security income benefits must also show that his income and financial resources are below a certain level.  42 U.S.C. § 1382(a).

5

granted a period of disability and receive disability insurance benefits, a claimant must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Aley satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured was December 31, 2006.

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

---

[5] The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

6

20 C.F.R. § 416.920(a)(4); *see also* <u>Morales</u>, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6] <u>Sykes</u>, 228 F.3d at 263.

Following the prescribed analysis, Judge Henry first concluded that although Mr. Aley had worked intermittently between his alleged onset date of disability, March 1, 2001, and sometime in 2006, none of his jobs as a pizza cook and delivery person or tow truck driver constituted substantial gainful activity for three reasons: the jobs were either only part time or lasted only a few weeks; Plaintiff testified he had stopped working on each occasion because of his impairments; and the record showed that his earnings each year from 2001 through 2006 were "nominal at best." (Tr. 16.)

Resolving step two in Mr. Aley's favor, the ALJ found that his only severe[7] impairments were arthralgia, bi-polar disorder and

---

[6]  Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. <u>Sykes</u>, 228 F.3d at 263, n2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n.5 (1987).

[7]  *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to

7

ADHD. (Tr. 16-17.) At step three, the ALJ concluded that Plaintiff's impairments, either alone or in combination, did not meet or medically equal any of the criteria of Listing 12.00 (mental disorders), Listing 1.00 (musculoskeletal disorders), or any of the other impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.)

At step four, the ALJ concluded Mr. Aley had the residual functional capacity to perform work at the medium level of exertion,[8] but due to his mental impairments, he would be limited to work which involved no more than simple, routine, repetitive job tasks, did not involve the stress associated with a fast-paced production environment, did not require more than simple, work-related decisions and involved, in general, only relatively few work place changes. Moreover, Plaintiff was limited to physical environments which did not require concentrated exposure to hot or cold temperature extremes, dampness, or humidity. (Tr. 17.)

Judge Henry further concluded that due to his non-exertional

---

interfere with the claimant's ability to work, regardless of his age, education, or work experience. <u>Yuckert</u>, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. <u>Id.</u> at 146, n.5.

[8] According to Social Security regulations, jobs fall into one of five categories corresponding to the physical exertion needed, i.e., sedentary, light, medium, heavy, and very heavy. Medium work requires the ability to lift and carry no more than 25 pounds frequently or 50 pounds occasionally and to stand or walk, intermittently, for a total of approximately 6 hours in an 8-hour workday. 20 C.F.R. §§ 416.967 and 404.1567. A person who is capable of performing jobs in the more strenuous levels is assumed to be able to perform jobs in the categories which require less exertion as well. <u>Id.</u>

limitations, Plaintiff could not perform any of his past jobs which had been described by the vocational expert ("VE") at the hearing, Timothy E. Mahler, as semi-skilled occupations or at the heavy exertional level. (Tr. 23; *see also* Tr. 264-265.)

In response to the ALJ's hypothetical questions at the hearing, Mr. Mahler testified there were numerous unskilled jobs which an individual of Mr. Aley's education, experience, and non-exertional limitations could perform in the local or national economy. He provided the examples of handpacker, janitor, material handler and shipping and receiving clerk, all of which were defined as medium-exertion, unskilled jobs. (Tr. 24; *see also* Tr. 265-266.) He also identified several light unskilled jobs such as laundry folder, office cleaner, product labeler and marker, and hand packers at the light level. (Tr. 266.) Based on Plaintiff's status as a younger individual[9] with at least a high school education, a history of work which did not provide transferrable skills, the medical evidence of record, and the testimony of Plaintiff and the VE, the ALJ determined at step five that Mr. Aley was not disabled and, consequently, not entitled to benefits. (Tr. 21-22.)

B.  Plaintiff's Arguments

In his brief in support of the motion for summary

---

[9] Plaintiff was 38 years old on his alleged disability onset date, making him a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c) and 416.963(c).

judgment (Docket No. 10, "Plf.'s Brief"), Mr. Aley raises only a single argument, that is, the ALJ did not properly consider and weigh the reports of his treating psychiatrist, Dr. Ben Brinkley, or his treating physician, Dr. Antoine Cawog. In her analysis, the ALJ concluded the opinions of these physicians should not be given controlling weight insofar as they suggested an inability to perform unskilled medium work activity on a sustained basis, largely because she found their final reports inconsistent with their own objective clinical findings and/or with the medical evidence as a whole. (Tr. 22-23.) Plaintiff argues that the ALJ inappropriately engaged in medical diagnoses by finding that he was not as restricted as the reports from Drs. Brinkley and Cawog imply. According to Mr. Aley, had Judge Henry properly weighed their opinions, she would have found him disabled and awarded benefits. (Plf.'s Brief at 6-7.)

C. Analysis

We begin our analysis by summarizing the Social Security regulations which describe how medical opinions are to be evaluated.

1. *Proper consideration of medical opinions:* Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who

10

have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, e.g., a one-time consultative examiner. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. §§ 404.1502 and 416.902.

The regulations also carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. §§ 404.1527 and 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) Id.; *see also* Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given

11

to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c)and 404.1527(d)(2).

2. *Medical evidence from Dr. Cawog and the ALJ's evaluation thereof:* Plaintiff first consulted Dr. Cawog on October 26, 2005, more than four years after he claimed he had become disabled in part from "a bad back" and "arthritis." (Tr. 57.) Dr. Cawog's notes from four office visits between October and December 2005 are focused largely on Plaintiff's gastric reflux condition, allergies, and asthma. Although the doctor's notes are brief and almost illegible, there is no obvious reference to treatment for back pain, arthritis, or arthralgia. (Tr. 145-146.)

There are no office notes for the eleven-month period prior to Plaintiff's hearing in November 2006, even though Mr. Aley testified that he saw Dr. Cawog every two weeks. (Tr. 240.) Despite the diagnoses mentioned just above, when asked to provide a medical assessment of Plaintiff's ability to do work-related activities, Dr. Cawog reported only those limitations related to Mr. Aley's arthralgia. (*See* Tr. 206-209, report dated September 8, 2006.)

Plaintiff argues that Dr. Cawog's records support the fact that he has had "some physical issues over the years." (Plf.'s Brief at 5.) He also contends that Dr. Cawog's report reflects Plaintiff's "physical difficulties that are certainly more than minimal" and suggests that his report be "given great weight." (Id. at 6.)

In her analysis, Judge Henry concluded Dr. Cawog's opinion was not entitled to controlling weight for three reasons. First, he provided no objective or clinical findings in support of his September 2006 medical assessment, for instance, his progress notes at Tr. 145-146 "make no mention of arthralgia or any related limitations." Second, she found his opinion inconsistent with the totality of the evidence, namely, a physical examination in February 2006 by Dr. Antonious Hanna which noted full range of motion in Plaintiff's neck (Tr. 200) and a report from Plaintiff's treating chiropractor, Dr. Gerald Irwin, who in January 2006 reported negative straight-leg-raising tests; no difficulty getting on or off an examination table, walking on heels and toes, assuming and rising from a squatting position, or sitting and standing from a seated position; and normal sensation, motor power, reflexes and gait (Tr. 148-151.) There was no clinical evidence of "any significant degenerative arthritic abnormality of the spine or joints," of "aggressive treatment such as chronic pain management," or any other treatment for arthralgia. (Tr. 17.) Finally, Judge

13

Henry noted that Mr. Aley reported "a relatively broad range of activities of daily living" and intermittent work even after his claimed disability onset date, all of which were inconsistent with the chronic debilitating neck, back, and joint pain he allegedly experienced. (Tr. 22.)

Plaintiff has not pointed to any errors by the ALJ in her analysis of Dr. Cawog's medical evidence except the ultimate conclusion that she should have given "great weight" to his opinions. We find the ALJ was correct not to do so. The lack of medical evidence to support the severity of Mr. Aley's physical disability due to arthralgia or arthritis is particularly persuasive. *See* Lane v. Comm'r of Soc. Sec., No. 03-3367, 2004 U.S. App. LEXIS 10948, *14 (3d Cir. June 3, 2004) (in determining whether the claimant has established that he is disabled, the ALJ may rely "not only on what the record says, but also on what it does not say"); *see also* Esposito v. Apfel, CA No. 99-771, 2000 U.S. Dist. LEXIS 1720, *12 (E.D. Pa. Feb. 24, 2000), *citing* Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) (same.)

3. *Evaluation of mental impairments:* Before addressing Plaintiff's argument that the ALJ did not give appropriate weight to the opinion of his treating psychiatrist, Dr. Brinkley, we summarize briefly the method by which evidence of mental impairments, including adult attention deficit disorder and bi-polar disorder, are to be evaluated according to Social Security

14

regulations. Both Listing 12.02, which pertains to adult attention deficit/hyperactivity disorder, and Listing 12.04, which is used to analyze bi-polar disorder, set out three categories which measure the severity and effects of the claimant's mental disorders, commonly referred to as the A, B, and C criteria.

The "A criteria" of Listing 12.02, organic mental disorders, require the claimant to demonstrate the loss of specific cognitive abilities or affective changes and the medically documented persistence, either continuous or intermittent, of at least one of seven dysfunctions of the brain.[10] To satisfy the "A criteria" of Listing 12.04, affective disorders, as they pertain to bi-polar syndrome, the claimant must provide documented medical evidence of the persistence, either continuous or intermittent, of "the full symptomatic picture of both manic and depressive syndromes." The manic and depressive syndromes, in turn, must be evidenced by a minimal number of particular traits.[11]

---

[10]   These disabilities include disorientation to time and place; short- or long-term memory impairment; perceptual or thinking disturbances, e.g., hallucinations or delusions; personality changes; mood disturbances; emotional lability and impairment in impulse control; and loss of measured intellectual ability of at least 15 IQ points or an overall impairment index clearly within the severely impaired range on neuropsychological testing. Listing 12.02.A.

[11]   In the case of depressive syndrome, the claimant must demonstrate any four of the following: pervasive loss of interest in almost all activities (anhedonia); disturbed appetite with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions or paranoid thinking. In the case of manic syndrome, the claimant must show at least three of the following: hyperactivity; pressure of speech; flight of ideas; inflated self-esteem; decreased

15

The "B criteria" of each Listing are identical. That is, the claimant's mental impairment must be of such severity that it results in at least two of the following: "marked"[12] restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[13]

To satisfy the "C criteria" of either Listing, the claimant must present medical evidence that his chronic organic mental disorder or affective disorder has lasted at least two years and has resulted in "more than a minimal limitation of ability to do

_____

need for sleep; easy distractability; or involvement in activities that have a high probability of painful consequences which are not recognized. Listing 12.04.A.

[12] "Marked" is defined as "more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Listing 12.00C, *citing* 20 C.F.R. §§ 404.1520a and 416.920a.

[13] The phrase "episodes of decompensation" is defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships or maintaining concentration, persistence or pace." Episodes of decompensation may be inferred from medical records showing the use of increased treatment or a less stressful situation (or a combination of the two), e.g., significant alteration in medication or the need for a more structured psychological support system such as hospitalization, placement in a halfway house, or a highly structured and directing household. "The term 'repeated episodes of decompensation, each of extended duration'. . .means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Listing 12.00C.4.

basic work activities." The symptoms or signs of the disorder must be currently attenuated by medication or psychosocial support. The C criteria also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or changes in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

To meet either Listing 12.02 or 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria.

4. *Medical evidence pertaining to Plaintiff's mental limitations:* Although Plaintiff objects only to the ALJ's conclusions regarding Dr. Brinkley's opinion, we find a comprehensive review of all the medical evidence concerning his mental limitations is in order.

As noted above, Mr. Aley began receiving mental health counseling in March 2001. His presenting problems were described as the inability to keep a job, disorganization, and mood swings; no medical problems or medications were noted. Although he received counseling an undisclosed number of times as an outpatient, by July 18, 2002, he decided he needed a different type

17

of counseling and was discharged. (Tr. 119-124.)

There is no evidence of any other treatment until May 30, 2003, when he began therapy through the Latrobe Hospital Mental Health Center. At that time, his symptoms included daily anxiety, repetitive religious thoughts, mood swings, manic-depression, insomnia/hypersomnia, and daily impulsiveness. His Global Assessment of Functioning ("GAF") score at the time was 55.[14] After missing or being late for several sessions, on September 3, 2003, Mr. Aley told his therapist that "no one is helping him enough," and that he intended to seek treatment elsewhere. (Tr. 125-133.)

Mr. Aley began undergoing therapy at Family Behavioral Resources in North Huntingdon as of October 28, 2003, and continued to meet with a therapist regularly, i.e., on a weekly or biweekly basis, through at least January 23, 2006. (Tr. 154-162.)

On January 19, 2005, Dr. Brinkley, who was on the staff of Family Behavioral Resources, prepared a psychiatric re-evaluation

---

[14] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002). A GAF rating between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See the on-line version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited June 5, 2008. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on a GAF score. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

18

report.[15] He indicated diagnoses of bi-polar disorder (which did not seem to be active at the time) and adult onset attention deficit/hyperactivity disorder for which Plaintiff had been prescribed Adderall and Xanax. (Tr. 144.) Mr. Aley reported difficulty keeping his mind on tasks, disorganization, obsessive ideas, and hyperactivity. Dr. Brinkley noted very rapid and somewhat scattered speech; i.e., Plaintiff bounced from one subject to another, but could be easily redirected. Other than believing he could "read the emotions" of others, Plaintiff showed no delusions or hallucinations and evinced no suicidal or homicidal ideation. He was oriented in all spheres, his immediate, recent and remote memory was intact, his ability for abstract thinking was not impaired, and his judgment and insight were considered fair. His GAF was 60 at the time, indicative of no more than moderate functional limitations. Dr. Brinkley noted Mr. Aley had been depressed following the suicide of his 21-year old son in August 2003 and what he perceived as lack of support from his former wife and other son in the aftermath of that death. He had been prescribed a variety of medications in the past, but refused to take many of them because of side effects. He had never been treated as a psychiatric in-patient and denied any medical injuries or prolonged illness other than some pain from a congenital

_____

[15] Although this document is referred to as a "re-evaluation," if a comparable initial evaluation was prepared between October 2003 and January 2005, it does not appear in the record.

19

abnormality of his back. (Tr. 141-144.)

Although Dr. Brinkley noted in the January 2005 report that he would continue to see Mr. Aley on a monthly basis for re-evaluation, there are no subsequent reports of such evaluations in the record. However, Dr. Brinkley completed a consultative examination of Plaintiff on February 21, 2006, at the request of the Pennsylvania Bureau of Disability Determination. (See Tr. 163-167.) Mr. Aley presented at the interview dressed appropriately, but was rather unkempt and his hygiene "somewhat less than normal." The history portion of Dr. Brinkley's report is largely consistent with that of January 2005 except the psychiatrist noted that after his son's death, Mr. Aley had become increasing depressed and had increased difficulty maintaining a job or getting along with co-workers. In the fourteen months since Plaintiff had stopped working in December 2004, he had been unable to obtain a job or keep anything more than brief temporary positions, despite repeated efforts to do so. At the time of the consultative exam, Mr. Aley had been prescribed Seroquel for mood stabilization and Strattera for ADHD. In the mental status portion of his evaluation, Dr. Brinkley reported Mr. Aley was alert, cooperative, and comfortable during the interview, but his arms and hands were "constantly in motion" and he fidgeted in his seat; eye contact was good if sometimes too intense; his mood was generally euthymic although he showed mood swings during the interview, e.g., increased anxiety

20

when asked to perform mental status tests. His emotional expression was generally appropriate to thought content and there was no evidence of hallucinations, delusions (either paranoid or grandiose), depersonalization or derealization. On the other hand, his thought productivity was described as "somewhat rapid and there [was] some evidence of flight of ideas," e.g., he moved quickly from one topic to another and went off on tangents. His abstract thinking was essentially normal and he appeared to have normal to above-normal intelligence. His memory was good for both recent and past events and he was considered an accurate historian. Although there was no evidence of difficulty with impulse control during the interview, Mr. Aley did report hostile moods and impulsive behavior in the past. His judgment was described as "essentially normal" but his insight as "somewhat limited."

In the final section of his report, Dr. Brinkley noted a general ability to perform most activities of daily living although his excessive sleep and mood swings caused problems in keeping appointments and similar activities. With regard to social functioning, Mr. Aley was described as either "somewhat intrusive to other people or [tending] to isolate and be to himself." He had reported an inability to get along with supervisors and co-workers and that he had frequent arguments with neighbors and landlords which resulted in firings, threats of eviction and similar problems. He concluded Mr. Aley "does demonstrate a great deal of

difficulty concentrating and this has been the difficulty with much of his ability to maintain a job;" he also noted frequent loss of focus and ability to maintain attention for any considerable period of time, and narcissistic personality features of which Plaintiff seemed to be unaware. Dr. Brinkley described Mr. Aley's prognosis as follows:

The probable duration of the impairment is indefinite but he may respond to a treatment and stabilization with medications. Current estimated disability is approximately 24 months.

(Tr. 166.)

5. *The ALJ's analysis of the mental health evidence and Plaintiff's objections thereto:* Although she did not explicitly state her findings as to the A criteria of Listing 12.02 or 12.04, we can assume Judge Henry concluded Mr. Aley met those criteria inasmuch as she proceeded to consider the B and C criteria. Drawing largely on a questionnaire in which Plaintiff described his own activities of daily living (Tr. 64-72) and on his testimony at the hearing, the ALJ concluded Mr. Aley experienced only mild limitations is his ability to care for his own personal needs, manage his financial affairs, prepare meals, maintain his household, and participate in activities with family and friends. (Tr. 18.) She also concluded there were mild limitations in social functioning such as interacting with others at his own home and elsewhere, going shopping, attending school meetings for his second son, and continuing to work on at least a part time basis for

22

almost four years after he allegedly became disabled due to his mental limitations. (Tr. 18-19.)

Judge Henry concluded Plaintiff had moderate limitations in concentration, persistence and pace, but retained the ability to perform simple, routine, repetitive job tasks. She based this conclusion largely on the reports by Dr. Brinkley in January 2005 and January 2006, Plaintiff's self-reported activities, and his ability to respond appropriately to questions posed to him during the hearing with no overt lapses in concentration. (Tr. 19.) She further concluded Mr. Aley's mental impairments appeared to be adequately controlled with psychotropic medication, psychiatric services and regular mental health counseling; moreover, he had never been hospitalized for mental impairments or otherwise satisfied the fourth B criterion or any of the C criteria. She did recognize, however, that given the history of his impairments[16] dating back to his early adult years, he "should avoid exposure to the stress associated with a fast-paced production environment, more than simple, work-related decisions or, in general, more than relatively few work place changes." (Tr. 19.)

The ALJ gave particular attention to the fact that Dr. Brinkley's opinions were internally inconsistent as well as being

---

[16] Mr. Aley reported mood swings and other mental disturbances as early as approximately 1981 when he was 19 years of age, i.e., some 20 years prior to his alleged disability onset date. However, he did not receive any mental health treatment in the form of counseling or medication for those conditions during that period. (Tr. 141.)

23

inconsistent with each other and with the other medical evidence of record; she provided several examples of such inconsistencies. (Tr. 22-23.) Judge Henry's ultimate conclusion regarding the evidence of Plaintiff's mental impairments was that neither the opinions of Dr. Brinkley nor the notes from the three therapy services Plaintiff had consulted should be afforded any controlling weight "insofar as they suggest an inability to perform medium work activity on a sustained basis." (Tr. 23.)

Plaintiff argues that "the ALJ did not properly consider" Dr. Brinkley's report of January 2006 (Plf.'s Brief at 4-5) and that she inappropriately engaged in medical diagnosis "by saying there is [sic] less restrictions than diagnosed" (id. at 6-7.) We disagree on both points. It is clear from the detailed analysis of Drs. Brinkley's reports in the ALJ's decision that she conscientiously reviewed them and based her conclusions on those reports, together with the other medical and non-medical evidence. Plaintiff appears to believe that his diagnoses of bi-polar disorder and ADHD are sufficient to support the award of disability benefits. To the contrary, case law clearly establishes that ALJ is to consider the functional limitations caused by the diagnosed condition. *See*, e.g., Foley v. Barnhart, 432 F. Supp. 2d 465, 473 (M.D. Pa. 2005) (diagnosis of an impairment standing alone is not sufficient; it "must be accompanied by functional limitations severe enough to preclude all substantial gainful activity.") As

to Plaintiff's implied argument that the ALJ ignored those portions of Dr. Brinkley's reports which would support the conclusion he is disabled and noted only those which would support the opposite conclusion, the case law is equally clear that the decision of the ALJ need only be supported by substantial evidence, not the preponderance thereof. As the Third Circuit Court of Appeals has noted, "substantial evidence is enough evidence to justify denial of a directed verdict to the opposing side if the matter had gone to a jury trial." Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Reefer v. Barnhart, 326 F.3d 376, 379 (3rd Cir. 2003). Because this Court must apply a deferential standard of review, "even if there is contrary evidence in the record that would justify the opposite conclusion, the ALJ's decision will be upheld if it is also supported by the evidence." Panetis, id., citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes, 228 F.3d at 262.

Consequently, having reviewed the entire record as well as the ALJ's analysis, we find there is substantial evidence to support Judge Henry's conclusion that Mr. Aley was not disabled at any time prior to January 26, 2007, and will affirm her decision. An appropriate Order follows.

June ___10___, 2008

William L. Standish
United States District Judge

25